All right, proceeding for the appellant is Ms. Atwood. Good morning, Your Honors. My name is Eleanor Atwood. I represent Traci Moultrie, the appellant in this matter. At summary judgment, Ms. Moultrie presented numerous facts, some disputed, some undisputed, that a reasonable jury would be allowed to disbelieve the department's proper reason for her termination. And that's what we had to present, and we did. In order for you to affirm the district court's ruling on summary judgment, you're gonna have to ignore three pretty critical undisputed facts. Number one, on three occasions in a six-month time frame in 2012, each of Ms. Moultrie's grievances of race and retaliation were followed by disciplinary measures. The longest span of time between complaint and discipline being two months. The second undisputed fact you would have to ignore to affirm the district court's ruling is the presence of an institutional grapevine demonstrating knowledge on part of the managers of complaints of race discrimination and retaliation. And the third critical fact that we presented evidence of was that unfortunately probationers are incorrectly incarcerated from time to time. And we had evidence of that and that others who mistakenly cause that incarceration were not disciplined as Ms. Moultrie was disciplined. Now, the district court seemed to struggle with basically two big components of the evidence we presented and found that, and frankly weighed the evidence to determine that we should not survive summary judgment, which is in itself certainly an issue. But to get to the substance of those two issues, I want to go to the knowledge component. The district court concluded that because Defendant McIntyre, who was the decision maker in Ms. Moultrie's termination, testified that she did not know if Ms. Moultrie's May 1st complaint until after she made the initial decision to terminate, that we did not satisfy the third prong of the retaliation prima facie case, the causal connection. Well, it goes without saying, of course, that a decision maker can't retaliate based on a complaint it doesn't know anything about. That goes without saying. That stands to reason. And although the district court did acknowledge the cases, a long line of cases in the 11th Circuit, that says knowledge can be shown through circumstantial evidence, it then proceeded to basically just dismiss the circumstantial evidence we presented on that point. Well, as I understand it, McIntyre testified that she, she is a she, right? Yes, ma'am. She was adamant that she had, when she recommended termination of your client, she had no knowledge of these recent grievances. She did testify that way, Your Honor. And you were not able, through depositions and all the discovery you conducted, to indicate that that was, the timing of all this was No, ma'am. They had no document that would actually tell you when she made the decision to terminate Ms. Moultrie. There was no email. There was simply her testimony. And the court relied on that. I believe that, that this is how it made sense, that, that the reason she knew then about the grievances was that whoever she was speaking to said, well, we need to wait on that because we need to let you know that, in fact, your client had, had filed grievances. So we need to Nothing in your discovery discounted that as being the accurate state of affairs, did it? Well, except all the circumstantial evidence we presented of, she did testify that way, Your Honor. I'm not, I'm not disputing that. But we presented what I believe was pretty strong. So you're not disagreeing that exchange occurred where whoever McIntyre was talking to said, hey, wait, you know, that, you don't disagree that exchange? No, ma'am. I do not. Our contention is that there is that a jury could, could reasonably infer from that evidence that we presented that McIntyre is not being entirely truthful. If this court... Can you correct me if I'm wrong? I thought, I thought the protocol was that McIntyre would not normally have been informed of this according to protocol of the office. That, that, that's where we differ on the record, Your Honor. Explain that to us then. Well, one of the issues is, and this was a term that Ms. McIntyre herself used. It's called the grapevine. That was her term. There was a way that managers within this very office discovered that employees had filed grievances. And, and we went back, we started with 2009 when Ms. Moultrie was part of the first round of grievances against a supervisor in the office who used the N-word. When, when a blitzkrieg of complaints came in about that, the grievance review coordinator actually emailed the FOMM at the time, the field operations manager, as he's not really supposed to do. It's kind of against protocol. But he notifies them and says, hey, I think we got a problem in Lawrenceville. You need to go over there and take care of that. And it was done. Any other instances other than that one instance three years before? Yes, ma'am. So, Ms. Moultrie's former co-plaintiff's name was Henry Chambers. And he was at the same time in this 2011-2012 time frame also filing race discrimination retaliation claims about what was going on in the Lawrenceville Probation Office. And on one occasion, he filed it with the Georgia Commission of Equal Opportunity, and they forwarded his complaint to Ms. Cashin, which was, I don't think, the typical protocol at a time. What was the year? What year was that? That was 2011. At that time, when he files that 2011 complaint, Ms. Cashin finds out about it and actually tells his supervisor, Mr. Fowler, who was also Ms. Moultrie's supervisor, hey, keep an eye on this guy. If he messes up, if he violates a rule, let us know. Ms. McIntyre herself testified, and I mentioned this. Keep an eye on this guy would be the guy that was... Mr. Chambers, yes, ma'am, the co-plaintiff. And again, all these things are happening around the same time frame within the same office, with the same chain of command, same set of decision makers. Also, when Mr. Chambers filed another complaint, and I believe this one was in... He filed two, sort of back-to-back again in February of 2012 and again in March of 2012. Ms. McIntyre, she admitted, yes, I heard through the grapevine, even though she wasn't supposed to, I heard through the grapevine that he had actually filed the Mr. Chambers, like Ms. Moultrie, suffered very... Well, he suffered reprimands, letters of concern within a very narrow time frame, within the three-month time frame, temporal proximity world that we live in here, and employment discrimination. And despite that, the court held as a matter of law that the decision maker didn't have knowledge, even though we demonstrated this temporal proximity, not just with regard to Mr. Chambers, but with regard to Ms. Moultrie, and that he had complained, they knew about the complaint, and he was subsequently disciplined. So, and I want to reiterate here, too, the temporal proximity is important on the causal connection piece, and knowledge only rebuts that presumption. Tell us, weave in for us, too, the timing then, the timing of the incident that caused her to get fired, was that she got somebody arrested who should not have been arrested, that their probation was over, and she had not bothered, according to the defendants, to even go try to find the file to make sure. So what was the timing of what she did with that person that she caused to be arrested, who shouldn't have been, their discovery of that false arrest, and all of these other instances, if you could weave the chronology in for us. I can certainly try, yes ma'am. In January 2012, she is given this list of people on this file to go figure out what's happened with this probationer, Mr. Johnston. She had never touched the file before, it was not her probationer. She's given a list of names. It's a report that's run, and Mr. Fowler comes to her and says, take appropriate action, figure out what's going on with this John Johnston, I think it's Johnston's for sure. So she'd never seen the file before, it's not her probationer. She looks for the file, she cannot find it. We presented evidence on that, and interestingly, Ms. McIntyre never even so much questioned Ms. Moultrie before she fired her to determine, did you actually try to locate the file? And it's undisputed, the file room is a mess. So she wasn't able to locate the file, even though she did try. Well, I read something, and maybe I didn't read it, that one of her explanations for not searching for the file is a mess, and it was dangerous for her, she might cut her finger or something looking through the files or nothing, nothing like that. I don't remember that. At the time, she was suffering from a worker's comp knee injury, and it was hard to get down because the files aren't in a, they're not in a drawer, they're all on the floor, there's pictures, it was a mess. But she did locate, she did try to locate the file, but Ms. Moultrie never knew that because she never bothered to ask her. But that happens in January of 2012. He is arrested in the beginning of June 2012 based on the warrant that Ms. Moultrie touched for that moment in time that she was given his name. And at that point, he is, he remains in jail for 25 days because the probation officer who's actually assigned to him at that time didn't follow department policy and go visit the probationer within seven days. His name is Officer Ray. I asked Ms. McIntyre about that. I said, Ms. McIntyre, did you look into what... I believe you're over your time, so if you want to finish up that thought, we'll hear from you again. And I'll sit down, I promise. I asked Ms. McIntyre, did you consider what should be done to Mr. Ray for not doing his part of the job, for violating the policy that he violated? Didn't even consider it. All right, thank you, Ms. Atwood. Good morning, Your Honors, and may it please the Court. My name is Tate Gray and I'm an assistant attorney general with the Georgia Department of Law. I'm here today representing the Georgia Department of Corrections, Sharon Cashin, and Marsha McIntyre in the appeal filed by Tracy Moultrie. On appeal, Moultrie challenges the district court's award of summary judgment with respect to her retaliation and race discrimination claims. As I will explain in further detail, each of the issues raised by Moultrie on appeal is meritless. Her retaliation claim fails because the unrebutted evidence shows that the decision-maker responsible for Moultrie's termination had no knowledge of Moultrie's grievances prior to deciding to terminate or taking any other adverse action. And again, this is a Georgia Department of Corrections policy where grievances are filed... She is. Why don't you talk to us about, she said policy, whatever, that there is this big grapevine there that everybody would have known. So if you could respond directly to some of the arguments she's made, that would be helpful. Yes. So first, Moultrie brings up this idea of a grapevine. She begins with this notification in 2009. So in 2009, multiple people filed grievances against an individual in the office called Clark Erick. The grievance counselor at the time, he's a difference grievance counselor, his name was Robert Cooley, notified a different FOM, field operations manager, called Michael Kraft. So we're dealing with two different individuals right off the bat. In 2009, he gives them a heads up, hey, there's this issues going on, just want to give you a heads up. That's the only... This is directed to the white officer who is allegedly saying racial things. Yes, Your Honor. About African-American employees. Yes, Your Honor. Again, that's the only evidence in the entire record of any kind of a formal indication when a grievance counselor tells a supervisor about grievances going on in under his command. Now, all the other evidence about... Apparently there were multiple grievances against the same guy. Three different people, I believe, filed grievances against them, against this one individual. And again, the Department of Corrections, they came in to the Lawrenceville Probation Office, investigated it, and the individual retired in the midst of the investigation before they can complete it. So that situation... They were concerned about his ongoing activities toward African-Americans. Yes, they were in the middle of an investigation. And again, that was in 2009 with a different grievance counselor and a different decision-maker in this case. So I don't think you can extrapolate a general practice, this great vibe, based on that situation, especially in light of a firm policy that every supervisor testified that the policy is that the grievance counselor does not notify the supervisors or the subject of the complaint until, at least at the earliest, the investigation actually begins. And that's what Marsha McIntyre testified as well. Now, the other grapevine issues that Moultrie has tried to bring up is the Chambers situation. Now, I mean, as it's obvious from that explanation, that was all centered around Chambers. None of that shows that there was a standard practice or a grapevine where Marsha McIntyre was notified through this grapevine about Moultrie's termination. Again, she unequivocally testified that she had no knowledge of these grievances until she made the decision to terminate and notified the Central Personnel Office. And then that's when they said, hey, she filed these grievances, we're investigating, so hold off for a little bit. And how did the Chambers business come to be? How did the supervisory people become aware of Chambers? Well, again, I mean, he's not a defendant in this. So my recollection from the record is that, again, there was a GCEO complaint. He was notified that way, similar to what Moultrie, opposing counsel, has testified to. But again, I'm not crystal clear on exactly that, because I was focusing my research on Moultrie. So you have a policy that they're not notified of these grievances. And again, that's what Marsha McIntyre testified to. The next issue, if there are no other questions about the retaliation piece, is the disparate treatment claim. Her disparate treatment claim fails because she cannot produce evidence of similarly situated comparators outside of her protected class who were engaged in nearly identical behavior and were treated more favorably. Essentially, Moultrie was terminated under unique circumstances for many of the comparators that were brought up on appeal. And I'd like to take a chance to address how those comparators are different. But first, before we do that, to determine whether an employee is similarly situated, the courts look to see whether the employees are accused of the same or similar conduct and are disciplined in different ways. It's important to note, though, that this circuit holds that a comparator's misconduct must be nearly identical to that of the plaintiff to prevent courts from second-guessing the reasonable decisions of the employers and to Moultrie was terminated for negligence and efficiency in performing her job, her duties, when she prepared and submitted an invalid arrest warrant for an individual named John Johnston without adequate investigation. Marsha McIntyre was the decision-maker in this case and she testified that there were three aggravating circumstances. Most damning is the fact that Moultrie failed to adequately investigate the individual's scribe notes. The scribe notes is the Department of Corrections case management system. There should be during the probation period. That's electronic? It's electronic, yes. In the record we printed off, there's a, the way it's presented in the record is print copies of what it would look like in the electronic. Ms. Atwood has said she didn't find the hard copy file but you're saying that there's electronic documents she could have accessed and if she had accessed the scribe notes, what information would she have found that's pertinent to this? Well, specifically there was one notation, this is on the fourth page of the scribe notes, and it essentially was entered on March 18, 2009 and it clearly indicated that the balance of the offenders probation had been revoked. It essentially said probation revoked, revoked to the state penal system, place file in closed file cabinet. That's another interesting thing about not finding the files. Had she read the scribe notes, the scribe notes also provided that the file was in the closed cabinet. So had she done the investigation, she would have A, realized, at least in the investigation of the scribe notes, realized that this person is no longer on probation and two, she would have known where to file the, find the file. And last, she made no attempt to locate or contact the offender to even see what the status of his, or see what his status was. But again, what it really comes down to is Moultrie had information that was easily and readily available to her in these scribe notes. I mean, it's halfway down the page, in the fourth page, it clearly says probation revoked. I mean, there's no ambiguity whatsoever when it comes, if you're a probation officer at the Lordsville Probation Office, that would have been a beacon saying this person is no longer on probation. However, she did not see this, either because she didn't, was skimming over it or didn't look at all. But for that reason, she decided, or I guess assumed, that he had violated the terms of his probation and for that reason prepared an invalid warrant for the individual, which resulted in his extradition from Michigan all the way to him sitting in jail for 25 days. Had she simply done this minimal investigation of the scribe notes, none of this would have happened. She likely would still have her job and Mr. Johnson certainly wouldn't have gone to jail. Now, to differentiate what Moultrie did with the comparators, the first comparator that the appellant brings up is Denise Fage. To begin, there was a different decision-maker with Denise Fage. Robert Kraft was the decision-maker in that McIntyre, Marsha McIntyre. Beyond that, Fage was what's called a classified employee and according to Georgia law, they are afforded an array of job protections. Essentially, you can't even discipline them without giving them an appeal window. They're not even really at-will employees. Moultrie was an at-will employee. So we're dealing with two different employee policies here. On that basis alone, these individuals are not similarly situated. But beyond that, Denise Fage was found to have violated a policy that requires certain actions be an individual. She kind of just dropped the ball after a person who was supposed to be in jail didn't get adequate attention after he was in jail. Here, we're dealing with an innocent man who was put in jail who shouldn't have been there. So two different policy violations, two different similarly situated, or not similarly situated individuals. The next individual that appellant brings up on appeal is Don Moorhan. Again, the decision-maker in this case was Michael Kraft and not Marsha McIntyre. So two different decision-makers. With Moorhan, there was testimony that she simply made a mathematical error. She was trying to calculate the expiration of an individual's probation period. There was testimony that there were several intricate periods where his probation had been told. Essentially, he had escaped from prison or escaped from custody multiple times and in that period, his probation was told while he was essentially out on the lam. And due to that, you had to add up these periods of time to determine when the end of his expiration was. Michael Kraft testified this is a mathematical calculation error that could have happened really to anyone. It doesn't excuse the error, but it's not one of completely failing to read the scribe notes. She read the scribe notes and she tried to make an analysis but just came up with the wrong answer. What she didn't do, and there was again with her case, there was no clear indication this person's probation was revoked on this date. She didn't disregard information that was readily available to her. Barbara McLean is the last comparator. With McLean, McIntyre was the decision-maker, but there was a different chief probation officer at that time. It was no longer Sharon Cashett. It was after she had went to a different probation office. She did prepare a warrant on an expired case. However, again with McLean, there's no evidence in the record that she, the scribe notes, showed that the offender of probation had been revoked. Furthermore, there was evidence during her, in her declaration, she testified essentially that there was a waiver that was filed in court in 2009 revoking three years of this individual's probation period, but that waiver was not documented in the scribe notes. So she was dealing with inaccurate, incomplete scribe notes when she was trying to calculate the end of that person's scribe notes, or probation period. So again, the main difference between her, between Moultrie's case and any of the other comparators is, is you have clear information that was readily available to her. All she had to do was read that one notation and she would have had the right answer. With McLean, you had inaccurate scribe notes. With Moorhan, you had calculations, complex calculations that you had to do. And then with Denise Fage, it's a completely different policy that she violated. And for that reason, the district court correctly determined that she could not make out a prima facie case. Now even assuming though that she, that I'm saying that for the sake of argument only, a prima facie case of retaliation or a disparate treatment, we still have non-retaliatory, non-discriminatory, legitimate reasons for the termination. It's not in dispute that Moultrie prepared and secured an invalid warrant that resulted in an instant man going to prison. It's not in dispute that she disregarded these scribe notes. I mean, they're in the record. Anyone can read them and know that this person's probation was revoked. None of that's in dispute, and that's the reason for the termination. We have not shifted reasons or anything like that. And again, it comes down to how egregious it was. It was right there. It was readily available. Finally, I would like to address Moultrie's contention that she has presented a convincing mosaic of circumstantial evidence such that could produce an inference of discrimination. Moultrie cites to this court's opinion in Smith v. Lockheed Martin for the proposition that a plaintiff's failure to produce comparator evidence is not necessarily due to a prima facie case. However, as noted by the court below, and as is true, the facts of the Smith case are unique and readily distinguishable from the facts that we're dealing with today. In Smith, there was a plaintiff who was a white male. He was basically terminated for circulating a racially derogatory email. He later finds out that there were black employees who did the same thing but were not terminated. However, you could not use them as comparators because he was a supervisor. They were non-supervisors. They were not criminally situated. However, the court found that there were three main things that could lead, three items of circumstantial evidence that led to this inference of discrimination. First, there was the evidence suggested that Lockheed's justification for firing the plaintiff was pretextual. Again, there's no pretext evidence here. There's nothing in dispute about the reasons for her termination. You know, her situation was more egregious than any of the the same arguments that legitimate non-discriminatory reasons the plaintiff has to come back and show pretext, and you're saying some of the same arguments you make to say there were no comparatives for purposes of the prima facie case also would discount any effort that we may hear from Ms. Atwood to argue that there's pretext as well. Well, I think there is present, that is a way to show pretext is by using these comparative evidence. There's other ways. But you're anticipating and trying to preemptively indicate that that would not show pretext. Yes, you're right. Yes, and it's important. A pretext means a lie. I mean, and it means more than just a lie. It means you're lying about the reasons for the termination, and on top of that, I think it was actually discrimination. And here, there's just no evidence to suggest that. The second reason that the the court in the Smith v. Lockheed Martin thought that there was this is that they found that there was a substantial, that Lockheed had a substantial incentive to discipline white employees more than black employees. And this stemmed from a prior workplace shooting wherein a white employee brought a gun to work and targeted black employees. There was also an ABC special going on basically accusing Lockheed of tolerating racism. So the court found that Lockheed was essentially trying to overcorrect. Here, there's no kind of evidence that suggests that the Lawrenceville Probation Office had any kind of incentive to discipline black employees more than white employees. And the last reason that the Smith court found that there was circumstantial evidence that it inferred discrimination is that they found that Lockheed consciously injected race considerations in its disciplinary process. When they were disciplining the plaintiff, they made a matrix. One of the columns in the matrix was what the individual's race was. So from the onset of the disciplinary process, Lockheed was considering race considerations, or was taking into account race considerations into the disciplinary process. Again, that didn't happen here. In fact, Marsha McIntyre testified that she didn't even know that Moultrie was African-American, which makes sense given the fact that she was ahead or at least in charge of the case. She didn't know, she didn't personally know the plaintiff to know what her race was. Yes. And I believe your time's up if you'd like to conclude with a concluding sentence, Will, your friend. Well, and for all the reasons that I've explained, Moultrie could not make out a pre-manifesto case of retaliation or race discrimination. And even if she could, we have non-retaliatory, non- her termination. And for these reasons, we ask that you affirm the award of summary judgment. All right, thank you. Thank you. What'd you say, Ms. Matwood? I say Ms. McIntyre knew Ms. Moultrie was black. She trained her. She's known her for 20 some odd years. She absolutely knew she was black. I also say that this is, Tracy was a decorated Department of Corrections officer. This is not a matter of she pulls up the sheet and willy-nilly issues a warrant. It said active, which means the case is active. Just like Ms. McLean, there was... What do you say to his argument that it's sort of basic 101 probation officer activity that you read the notes through to make sure that there's no problem with the warrant? You disagree with that I say in an ideal world, absolutely, that's what should happen. And should, in hindsight, Ms. Moultrie have done that? Yes. But I also say that Department of Corrections probation officers who are overloaded in their cases and being shifted from caseload to caseload make mistakes. And it happens more often than we want it to. The question is not did she make a mistake? The question is did other people who were white and did not file complaints of And the answer is no. Well, is your argument both racial and because she filed a complaint? Yes, ma'am. It's based on both race and retaliation. And that's why the second set of comparators that they don't talk about much and that the district court didn't even really touch on is important. Because that second set of probation officers who were on this file, the Johnston file, didn't notice he was in jail incorrectly, inappropriately. And he sat there for 25 days. Now, and they weren't punished. Ms. McIntyre didn't even consider it. And the question is that the jury should be allowed to figure out why didn't Ms. McIntyre even think to look into how Mr. Ray and Ms. Corbin violated policy and why weren't they disciplined? It didn't even cross her mind. Why? Our contention is we presented enough evidence that she was, she knew about Ms. McIntyre's complaints because that's the grapevine in this office. And that she was irritated that Ms. Moultrie would do so because Ms. Moultrie goes to see the EAP lady in the midst of all these complaints. Okay? The EAP employee testified very clearly. I've known Marsha McIntyre for 15 years. She found out somehow that Ms. Moultrie had come to see me two days before and she called me and she was angry. She was angry that the EAP lady was trying to come to bat for Ms. Moultrie. There is knowledge. This is- That was when the EAP lady had, I've forgotten the particular suggestion, but had made some suggestion that Ms. Moultrie do something, correct? It was about whether she was supposed to take sick leave or worker's comp, and they were trying to work that out. But Ms. Moultrie testified, I also alerted her to the race discrimination and retaliation issues because those issues were part of her feeling that, wow, Ms. Cashion is coming down on me and I can't quite figure out why. It doesn't make sense. I also want to say that they made this argument at the district court and unfortunately the district court bought it and shouldn't have because the managers is not- It doesn't mean that the employees aren't similarly situated. You can have similarly situated employees for purposes of comparator evidence with different managers, especially in this kind of case where there's a system, there's an automated system and you put in the infractions and you put in the rule violations and a type of discipline is recommended. It basically automated comes up. The two comparators that he talks about that Mr. Kraft disciplined, he followed that recommendation. That recommendation was six months of pay cut at 5%. And those two probation officers, those were their probationers. They knew that file. They had managed that probationer for months or years. And those probationers sat in jail wrongly for 11 months and nine months. And the recommended discipline based on the automated system was six months, 5%. Now, why didn't Ms. McIntyre follow that? His argument, I gather, and obviously you disagree, this argument that there's a difference between something falling between the cracks or not paying attention and affirmatively when you're getting ready to do a warrant, not reading the things you need. It's an affirmative, more an affirmative omission. That's his argument and you disagree with that argument. I do, but I also say that Ms. McLean also took out a warrant. She was one of our comparators. His argument, again, I'm not endorsing it. His argument is that the scribe notes didn't say clearly on that, that a warrant shouldn't have been issued, whereas they did on your client. What's your response to that argument? Well, I didn't see the scribe notes on that one because we didn't get that evidence. But what I would say is, listen, these are all fine arguments to make in front of a jury, to let a jury decide whether this degree of specificity is required or whether in common sense logic that you bring as a juror that this just doesn't sit right, that there's something else going on. And we certainly demonstrated enough circumstantial evidence that a jury should at least be allowed the opportunity to look at it. All right. Thank you, Ms. McLean. Thank you so much. All right. Our third and final case today.